Good morning, and may it please the Court. I'm Mark Freeman on behalf of the Secretary. The judgment of the District Court in this case should be reversed because Mr. Poland failed to show that the agency's decision to transfer him from his job in Portland to his job in Virginia was motivated in part by a desire for reprisal. That is, that the employer's decision was motivated by a desire for reprisal. That's what he was obligated to show to make out his claim of retaliation. Instead, what Mr. Poland showed was that his immediate supervisor, a gentleman in the Customs Service, a middle manager named Gary Hilberry, was motivated in part by a desire for reprisal when he suggested to the Customs Service that they undertake an investigation into Mr. Poland's performance as the manager of the – That's putting it nicely that he suggested. He provided them with a substantial – No, that's right, Your Honor. A substantial memo with details and facts and people to interview and everything else. No, that's – He didn't just say, you know, I think we've got a little problem over here. We've got to, you know, we've got to do a little investigation, or we've got to do an assessment of his performance. No, that's right. But on the other hand, it's equally clear the agency didn't treat the papers that they received from Mr. Hilberry as dispositive of anything. No, that's – but, you know, it's just – you know, you've got to put this in proper context. No, agreed. But my point is simply, Mr. Hilberry didn't have the authority to order an investigation. He didn't have the authority to take any adverse employment action against Mr. Poland. All he did was ask requests, suggest, whatever word we use, that the agency headquarters in Washington appoint a panel to investigate this. And the point that – I'm sorry. On this issue, it appears that the ultimate decision-maker was not biased. I could be mistaken of that. But it appears that this special panel wasn't biased, but that there's evidence, certainly, that the person who initiated the investigation or the review had some age bias. So my question is, when we try to look at causation – Yes. – as to whether there's a retaliatory intent, would we have to conclude that the decision-maker committee or review panel was merely a rubber stamp for the middle manager who started this whole thing rolling? Or would it be enough if there was something that that manager did that was relied upon by the decision-maker? The court – this court does not have a decision on that point that resolves the precise standard. It does cite in – the court has cited in the Hernandez v. Space Labs medical case – that's a 2003 decision cited in our brief – reported with approval a Fifth Circuit case for the proposition that the causal link can be the ultimate decision-maker did not merely rubber-stamp the recommendation of the employee with knowledge of the protected activity. So, I mean, that's certainly true here. There's no suggestion that Ms. Tischler, the Commissioner of Customs who was the final agency decision-maker here, rubber-stamped or in any way simply approved something that Kilbury, the person with the impermissible motives, said, hey, you should do this. Oh, you're right. That looks good. Now, that's the fact pattern in many of the cases that Mr. Poland relies on. And in other cases in this circuit, for example, the Bergeen v. Salt River Projects case, it's 2001, where the court said – the argument there was similar. The final agency decision-maker was concededly unbiased, but – and the argument for the defendant was, hey, no liability. The person who made the decision had no bias. And what the court said was, well, hold on. The person who was shown to have bias in that case against some – the plaintiff who was directly lobbied the final decision-maker and, in fact, persuaded the final decision-maker to change the eligibility criteria for the job that she was seeking so as to work out to her detriment. And what the court said was that he played an influential role in the final decision, the person with the bias. So I think taking these cases together, the court – whether a rubber stamp is all you need to show, or whether it has to be an actual, like, literal rubber stamp, or whether you need some kind of coercion or undue substantial influence is perhaps a question this Court hasn't considered. But the point for present purposes is that, in this case, nothing close to either of those standards has been shown. And – But you – you would say to give a list of witnesses isn't sufficient. No, Your Honor. Certainly, just giving a list of witnesses isn't sufficient. Where the agency then appoints three people who it's – who it's undisputed, had no relationship to Mr. Pollan nor to Mr. Hilberry. They were senior Customs Service professional investigators. These are people who normally investigate crimes. They know what they're doing. And they went out and took – they didn't merely interview the witnesses. They took affidavits from each of them and attached those affidavits to their report, which went up to – Were those the same people that – that were identified in the memo? The witnesses? No, Your Honor. Substantially, yes, but not entirely. Mr. Pollan – excuse me. Mr. Hilberry suggested a list of 21 witnesses, I believe. And the agency ended up interviewing 21 witnesses. But nine of those – it did not interview nine of the people proposed by Mr. Hilberry and added several names of their own. I would also note that, of course, the investigative panel interviewed Mr. Pollan exhaustively. And furthermore, Mr. Pollan submitted 180 pages of documentation of his side of the story. Did any witnesses identified by Mr. Pollan make it into the interview pool? Well, Mr. Pollan was not asked for a list of witnesses he would like to have submitted. But we don't – How was that? I'm not sure, Your Honor, but there's no suggestion that when an employer undertakes to figure out what the truth of the matter is in a particular case, that they need to ask Mr. – the person they're investigating, who do you think we ought to talk to? That might be a good idea. But here – I mean, if there's any question, did Mr. Pollan have his opportunity to get his side of the story in? He submitted 180 pages of documentation in addition to his own exhaustive affidavit. And that affidavit and those pages went to the administrative inquiry panel, to the disciplinary review board for the – What were the main accusations against Mr. Pollan? It was – That Mr. Miller raised. Yeah. It was – that's in – it's in the record. The request is on page 28 of the Excellence of Records, so the Court can look at it. But it was a variety of complaints about general mismanagement of the Portland office. That his – Weren't there also complaints that he didn't manage women in some – in an appropriate way? Yes, Your Honor. I don't know if there were allegations of sex discrimination, but allegations of some problems in supervising women. No, that's exactly right. There was an incident in which, when Mr. Pollan was reporting to the office in Seattle, there was an incident in which the only female officer in his office came into work one day and found a full-color photograph of sperm on her desk. And Mr. Pollan – and there was a subsequent lawsuit about this, not surprisingly, and Mr. Pollan, who was going to be a witness for the defense, speaking with agency counsel, said, I don't see a problem with that. It's from a scientific magazine. What's the issue? And the agency had a problem with that attitude. And one of the people that the – that the panel spoke with, the investigative panel spoke with and took an affidavit from, was the agency counsel in that case. How long after the fact was that investigational? That was the investigation after that incident. It was some number of years, Your Honor. Yes. And there's no – the point here is not that there was any discrete firing incident, a culminating incident that would have prompted an adverse employment action. In fact, the Discipline Review Board, which was the intermediate level of review in this process, concluded in Mr. Pollan's favor that there was no basis for a formal demotion or any kind of formal disciplinary action, precisely because the allegations and the findings of the administrative inquiry panel were sort of generic things spread over a series of years. What the Discipline Review Board said was, it's clear to us from all of this that there's no basis for disciplinary action, but at the same time, it's also clear to us that he isn't a good manager, that his employees are terrified of him, and that, at a minimum, we should no longer have him be a supervisor. And that's what the agency – that's the recommendation the agency ultimately accepted. They didn't terminate him. They transferred him to the East Coast in a position where he'd get the same pay, but without being a supervisor. That's correct. And furthermore, they paid for his move across the country and gave him a living stipend to offset the change in cost of living. And he worked in the new job for a number of months, right? That's right. And then after that, he quit. And his position is he was constructively terminated, which is what the district court found. Yes, that is what the district court found. Maybe you could address constructive termination, because that was a major issue in my mind. But what precedent is there that bears on whether a transfer of an employee to a different location with – and a reduction of responsibilities can be considered a constructive termination? I'm not aware of – No, we know the simple cases of constructive termination, where someone gets put into a room filled with rats or insects, or there's some conditions of work that are so hostile that they obviously can't stand it. I haven't seen a case previously where reduction of responsibilities was considered a constructive termination. That's right, Your Honor. I'm not aware of any case holding that. The district court cited none. The district court's discussion is on page 143 of the excerpts of record. It's two sentences, and the reasoning appears to be that Mr. Poland believed that it was a career-ending position, that there was no further prospect for advancement, and that he was reasonable in believing that, and that therefore he was constructively discharged. Assuming that it's true that his career is not going to go anywhere further, is there any precedent that that would be a constructive termination? No, Your Honor. The Court is well aware, of course, that there are thousands and millions of jobs in this economy with no, including mine, with no realistic prospect of advancement. But I think it does not follow from that that any person in one of those jobs has for that reason been constructively fired. Would it make any difference if they moved in 3,000 miles across the country? I think it might in some circumstance, Your Honor, but not here. I mean, first of all, Mr. Poland … How long had he been here in Portland? He had been here in Portland, I believe, since 1991. But he had previously in his career been moved across the country for the good of the agency twice. And moreover … He had worked in Washington, D.C., right? That's correct. Earlier. Yes. And he had worked in Seattle earlier? No, I don't … Or Texas? Perhaps the opposing counsel can clarify that. I don't believe he worked in Seattle. He did report to someone in Seattle. He reported to Seattle. But he had moved back and forth across the country several times. How were those transfers effectuated? Was he given the opportunity to request those changes, or was he told on this particular date, report to Washington, D.C.? Weren't they a little different? Those previous … Oh, no, they were different. I'm not arguing that they were the same. My point is simply that in an agency in which people are transferred across the country, would a reasonable employee … Because that's the test. The Supreme Court in the Souter's case made clear that it's an objective inquiry for constructive discharge. And the question is whether the working conditions were so intolerable that no reasonable employee under the circumstances would have been able to stay in their position and continue to serve their employer. How old was he when he moved, when they forced him to move? I believe he was in his 50s. Let me ask you another question here. Let's assume that on the first issue of causation that we went against the government. I think it's a very close issue. Let's assume that we decided that the reassignment had to be considered retaliatory because of the role of the manager who started it, but also concluded that the transfer to the East Coast office doesn't meet the legal standard for a constructive discharge. Yes. What would be the result then? The damages that he received would be on the wrong basis. That's right. Would the result be a remand for a different assessment of damages? Your Honor, I believe the result would be a reversal of the damages award and an entry of judgment on retaliation. The reasons I've said, we don't agree with that, but the result would be an entry of judgment for retaliation, but no damages. And that's for several reasons. Because, well, if I may take a step back, there is a difference between the standard for what is a adverse employment action for purposes of retaliation under the Burlington Northern Standard the Supreme Court recently announced, and this Court's decision in Ray v. Henderson, which essentially predicted that outcome, it's just anything that might deter a reasonable employee from asserting their rights. Well, that standard, of course, doesn't line up in every case with economic injury. And this is one of those cases. Here, he was no change in pay or benefits, and furthermore, they paid for his move and gave him a living stipend. So the fact that those standards aren't the same, don't match up, necessarily contemplates that there will be cases, and we submit that this is one, in which you have retaliation but no economic injury. And so someone can retaliate with impunity. No, Your Honor. No, not at all, Your Honor. Because in this case, Mr. Poland has not sought reinstatement or injunctive relief. But, of course, in another case, one could get such an award, and then the employer would be under a court order. And I should add that the government takes very seriously a judgment from the Court of Appeals from the Ninth Circuit that they acted with retaliatory intent. Let me ask this question on damages. In this kind of a case, if we decided it was a retaliatory transfer because of the role of the middle-level manager, but that the damages for constructive termination were wrong, would he be able to claim damages for anything other, like, you know, emotional distress? Or, I mean, would that be considered, since the salary was the same, could he recover after some fact proceeding, some measure of damages, if it turned out he was right, that he shouldn't have been transferred? No, Your Honor. And that's for two reasons. First, this Court has held, and I'm sorry, I forget the case. It's in our brief, that even under the private provisions of the ADEA, private employer provisions, that there are no damages for emotional injury. And in a case against the Federal Government, that is underscored by the fact that there's no waiver of sovereign immunity for those damages. The Tenth Circuit held that in the Valeska's case that we sat in our brief. He can only recover economic damages. That's correct. That's the only kind of damages that Congress has contemplated. Now, I hesitate to add, I mean, I hasten to add, all of this could have been avoided if Mr. Poland, assuming that he showed that his transfer across the country was motivated by retaliation, all of this could have been avoided if he had stayed in his job and said, I want to be put back in my position. But we don't have any argument that he was entitled to assert that. But instead, Mr. Poland said, I'm going to work here. I'm not going to make any noise about my working conditions. And then I'm just going to take early retirement. And having taken early retirement, receiving from the Federal Civil Service, he's not in a position now to seek reinstatement. And he never sought that. And so he was left to seek whatever economic injury he, to recover, whatever economic injury he suffered. And in this case, there was not. So while I recognize that it's a counterintuitive sort of proposition that an employee might be retaliated against but have no economic injury, I suggest that that flows from the fact, as I said before, that there's no, there is a difference between. Could we, if we were to do what Judge Gould was discussing with you, we send it back on the damage issue, could he read, could he, could he change his position and say, I want to be reinstated now? Your Honor, I, I would like reinstatement and unravel all, the only reason why I retired is because I was going to get this, you know, I was seeking damages and, you know. Right. Your Honor, I, I think, I mean, the court, of course, can order the remedy that it thinks is appropriate. I, I, I can tell you the government's argument in that case would be, look, you, through this whole trial, you never said you wanted reinstatement. You didn't say you wanted to go back to your previous job in Portland. You never asked for this. And you took early retirement rather than pursue your rights. Under those circumstances, whether you call it waiver or whether you call it too little, too late, it, it, we don't think there's an opportunity for him to make that offer. That should be decided by the district court. Yeah, wouldn't that be a district court decision? We, we don't have any argument with the idea that the district court could resolve that. But I, I do know he's never made that, the argument that there were other damages. He may not want to do that, but, you know, he's still a young man, at least by judge standards. Yes. He might be a year or two younger than I am, but I don't think I want to do early retirement. Yes, Your Honor. I would reserve what little of my time I have remaining for rebuttal. Yeah, that's fine. We'll, we'll add an extra minute or two, and we'll, we'll give your colleague an extra minute or two if he needs it. May it please the court, counsel, Kevin Keeney appearing on behalf of Mr. Poland. Judge, he was 55 when he was forcibly transferred. Very young. And judge. By judge standards. By judge standards, yes, Your Honor. But at the peak of his career by custom standards, peak of his career, and also, judge, all of those other transfers were consensual transfers. They were not forcible transfers like this one was. He didn't have a choice other than to resign or, or be fired. Well, let, let's, let me cut right to the quick on that. Sure. I mean, my, my view is the causation issue is very difficult. We'll come back to that. But assuming that the transfer by this panel is tainted by the initiator's bias. I don't, I'm not aware of any precedent whatsoever that supports the idea that reducing someone's responsibilities while paying them the same amount of money amounts to constructive discharge. So if you have, you know, I would say what's your best case on that point? I understand the general standard. Would an objective person feel it's just intolerable to continue working? Why would an objective person consider working for the same pay with less responsibility? Responsibility means they're fired. Well, Judge, it's, unfortunately there are no bright lines in this area. We've cited cases to you. There's no case that's quite on point. I, I couldn't find a case on either. No. You know, either the set. There isn't. It is constructive termination or it isn't. So, it may be an issue of first impression. There is, it, it, well, I don't know, first impression. I think there's some, there's some broad guidelines here that the district court then applied, and it would be our position that you're reviewing for clear error at this point, in any event. But I would say that the, the case of I'll, I'll find it in just a minute. I, I want, Judge, I want to address what happened, because I don't know that the court has a clear idea of what happened. It's, it's at ER 58, excerpt from record 58. This wasn't just yeah, he, he had the same pay. But this wasn't just we're going to move you someplace else. This was, he had lived in Portland to begin with for ten years. He had a family here. He had kids in high school. His wife was here. And he was, you know, he was involved and established in the community. What they did was, on 30 days notice, they took him out of where he was in, in Portland, and they forcibly transferred him clear across the country to Vie, to Vienna, in Virginia. Gave him a dead end job. And it was a dead end job. At ER 58, he tells you exactly what he was told to do, do once he got there. And I asked him this during the trial. I said, what were you doing? He said, what, what I was told to do was, they would bring papers to me in the morning, on one side of my desk. I would put them in the middle of my desk, look at them, check a box, and put them on the other side of the desk. So I moved papers from the left side to the right side. Now, this was a man who was the resident agent in charge of the Portland office. The highest customs official in this part of the country. And what they did to this poor man was, they took him from Portland, Oregon, at a very high position. It's almost like your rat example, Your Honor. They took him from this very high, there weren't any rats that I'm aware of. But they took him from this very high position in Portland, Oregon, and they stuck him against a wall and told him to move papers from one side of the desk to the other. So why wouldn't he have asked- That was a demotion, for sure. Why wouldn't he have asked for his position back? Why would he not- Why didn't he ask for that? For the reason that, I think, the district court gave, gave, Your Honors. There's a finding in this, or maybe it's a conclusion of law. There's a conclusion of law by Judge Brown where she says that he had made other age discrimination complaints and retaliation complaints. And they were, he was met with reprisals. In fact, that's what got him in the, in this situation to begin with. He was making age discrimination complaints and retaliation complaints against this guy Hills, Hilberry, who was not a middle manager, by the way. He was a senior manager in the Denver office. He was synonymous with the customs service. He was making these complaints against this guy, Hilberry. He was making them to customs, and it was making his life worse. So, Judge Brown also found that he reasonably believed, at that point, based upon his 27 years with customs, based upon his vast knowledge of how customs operates, that this was it. He was stuck up against the wall. Judge Rawlinson's question, or maybe this is the question in my mind, is going towards why wouldn't he ask for his job back when he brought his federal suit? Reinstatement. Why wouldn't he seek the remedy of reinstatement? I understand why he wouldn't- Okay. Why he wouldn't, when he got to the D.C. area, say, hey, please send me back, you know? Well- Because they'd decide that. He really, he took early retirement. I apologize if I missed that, the thrust. But I was attempting to answer it, actually. Here's the reason. For the same reason that someone who is the victim of sexual harassment will not ask for their job back, if the harasser is still there. You will not ask for your job back to go into a sexually harassing situation. And this is the same kind of situation. You will not ask- In the alternative, you can ask for your job back or front pay, you know, back pay. There are a number of alternatives you can couch as substitutes for the reinstatement. That's what we asked for. We asked for damages, front pay, and that's what the district court awarded. But for constructive discharge, not in lieu of reinstatement. Well, I mean, Your Honor, what the court found, and it was a damages phase, was he was going to retire anyway in three years. Okay, that's what the court found, and that's the amount of damages that was awarded. So it was essentially for what was alleged in the complaint, which was for early retirement. He wanted the difference, I was going to work out the X number, you know, this day, and I was forced to retire. So award me this amount, and that's exactly the amount that was awarded. Yeah, because when I was a district court judge, if I had civil rights cases and the person said, I want reinstatement, but I can't go back there, then you fashion a remedy if they can't go back there that gives them the money that they would have gotten if they were able to go back. And that's what Judge, well, that's what Judge Brown, well, she didn't, well, actually, I think she wouldn't. As for reinstatement, so she didn't fashion that type of remedy. She did a constructive discharge, because that's what you asked for. If I'm understanding, no, she did not award the value of what he would have earned had he continued to work. Actually, what she awarded was less because, I think this is right, because it was more based upon a retirement. On what theory, on what theory were the damages awarded? They were awarded on the basis that he would have worked, I think, till the year 2004. But what was the legal theory? Constructive discharge, yes, that's true. And Judge, what I was attempting to answer with you was that there's a conclusion of law which says that he had made these complaints previously. And every time that he made them, there was a retaliation. So it doesn't make any sense to keep on making complaints or, as counsel suggests, try to work with the organization. When you do try to work with the organization and follow their EEO procedures and so forth, you get a retaliation. It doesn't make, at some point, you stop. But if you tell the federal court they retaliated and I want to be reinstated, it seems the fact that they retaliated earlier doesn't itself mean that there's no reason to ask the federal court for reinstatement as a remedy. Right. Because presumably if the federal court said you retaliated, that you were retaliated against and we're reinstating you as a remedy, that you wouldn't expect that there could be retaliation for that. One would hope not, that if the court ordered your reinstatement, that there would not be retaliation on that basis. Let me just summarize, just to put this part of this to rest. What are the factors you point to, facts, that the district court found, that when you add them all up, equals constructive discharge? Sure. The first one would be that he was demoted to a non-supervisory position. That was clear. He was a manager and supervisor. He was supervising no one. It was a forced 3,000 mile transfer away from his family to a dead end desk job, which is what it was. And then I think also central to the court's decision was that it was a reason, he had a reasonable belief that this was a career ending event. He was close up against his retirement and he, based upon his own understanding. Is there any evidence in the record that showed that, you know, that the customs agency, you know, maybe not routinely, but if you work for them, then you can expect to be transferred across the country, you know, at just about any time? There is a document that was admitted, and I don't recall the exhibit number, which says that when you sign out with customs, you agree that you can go, I guess, anywhere in the world or be transferred anywhere in the world. That's correct. There is that. Let me get back to the issue of constructive discharge just for a second. Do our circuit's precedents indicate any level of deference that we're supposed to give to reviewing Judge Brown's conclusion on constructive discharge? Is there a precedent? Yeah, I mean, my impression was that there were some cases that suggested that we might review that for clear error. Yes. But yet, it seems to me that it's not a strictly factual finding, that it has some legal elements to it. Well, I started the side of the standard on page 18 of my brief, and that's the Schneidrig case, whether plaintiff was constructively discharged as a factual question, entitled to review for clear error. There is another case which both sides have cited. It's called Watson versus Nationwide Insurance. This was cited by the defense, and it's 823 F. Second 360. I believe this was a summary judgment, but the court does say, in this case, the Ninth Circuit does say that this is normally a factual question left to the prior fact. Now, if I could shift you back to the first issue. Sure. Of whether the agency should be held responsible for retaliation in light of the middle manager's initiation of this. It sounded as if the language in that Hernandez v. Spacelabs case might suggest that they would be responsible if they rubber stamped what the subordinate did, but that apart from that, apart from a rubber stamp, that it wasn't really clear to me what the law is if the subordinates, if the person with animus has just sort of set things in motion, or maybe affected them somewhat by giving a witness list. Do we have any law on that subject? There's nothing clearly stated, your honor. And in fact, it's not a rubber stamp standard. It's not. That's not the law of this circuit. In fact, I've cited you, Gilbrook, there's Burgreen, there's a number of cases. There seem to be a number of considerations, and the court seems to be looking for how closely involved with the decision the biased person is, okay? In this case, first of all, it's clear, and the district court found, that there never would have been any kind of discipline at all, but for Mr. Hilberry's retaliatory motive. That's clear, and they don't even challenge that. Right. So that's clear. It's clear, but for causation, maybe could be met. Well, it's a motivating factor. Might take but for at one extreme, and rubber stamp at the other, and wonder if the law is somewhere in between. And that's why it's important to understand the process here. And the process is that Mr. Hilberry clearly retaliated. He was the customs service. He was sufficiently high in the pecking order of the customs service that he is synonymous with the customs service. And the district court said customs initiated the retaliation. Okay, that's important. This process then goes to, as one of the judges, one of your honors mentioned, he writes a memo. He writes a 16 page memo, and he dredges up, drags up all this old stuff that's been on his watch, and he never did anything about, but all of a sudden it's a problem. Four years worth, and he stuffs this all into his 16 page memo, which frames the issues for the disciplinary panel, okay? Not only does he do that, he attaches to that a 21 list, 21 witnesses, list of 21 witnesses that he wants the disciplinary panel to take a look at. So now he's framed the issues, he's told them who he has said, go talk to these witnesses who have either personally experienced Mr. Pollan's insulting and arrogant behavior, or who have heard of his demeaning behavior. 21, I went through those 21, and my numbers are different considerably than counsel's. There were 17 interviews and affidavits that they went and did. 12 of those were from the people on the list, including Mr. Hilberry. One was not on the list, but is mentioned in the text, Diane Lefkoe, who's very critical of Mr. Pollan. Two others who are very critical of Mr. Pollan, and then Mr. Hillman and Mr. Pollan himself. So out of 17, 15 end up being very critical. So now he's framed the issues, now he's told the disciplinary, here's the witnesses, so go talk to these folks. And on top of that, in a 600-page record, he throws in 200 of the pages to further put the icing on the cake here. And then he's one of the prime witnesses that they interview. So my point is this, Your Honor. If it's not but for causation, if it's not just a motivating factor, that once you set the ball in motion, once customs sets the ball in motion, customs has to do something truly independent to break the chain of causation. If it's not that, and we submit that it is, we submit that that's the standard, and we argue that. If the standard were that the manager with the animus had to have been a material factor in the deliberations, would it meet that test? Yes. You don't have any case saying that's the test. You don't, you don't. But if we said that was the test, do you think this case would meet that? Yes. Because they can't, once they get, once customs starts the ball in motion, going to mix the metaphors here, they can't wander it by saying, oh, well, we're just going to pass it through a bunch of unbiased people once they've started that ball in motion. Remember, there was no, this would not have been investigated except for Mr. Hilberry, there was no other event that came up that they started investigating that then led to the constructive discharge. This was all of a piece that Hilberry started. Our first position is, once he starts that ball, once customs starts that ball in motion, they're responsible for the outcome. Our other, if you don't buy that, our other position is, well, look at what Hilberry did. He framed the issues, he submitted the witnesses, he appeared as a witness, and then he submitted the, one third, over one third of the documentation. So he continued to be, as Berggruen, is Berggruen, Berggruen, one of your, one of your precedents says, he continued to be involved in the decision. Let's assume that the panel. That's the other extreme. Let's assume the panel ends up agreeing with you rather than your colleague on that point. Okay. But if we conclude it wasn't a constructive discharge, then what can we do then? Well, I think if you were to go that route, it would have to be remanded to the district court. I don't agree with counsel's statement that there weren't other damages. I think Mr. Poland, during his direct examination, said that not all of his, you know, such factors as, not all his moving expenses and things like that were reimbursed. So there were other damages that kind of fell out of consideration when we went to the constructive discharge. But I don't think it would be appropriate for this court to do anything else other than remand. That would be a remand. Right. Would it still be open for him to say, I've changed my mind, I want to go back to work? Maybe he doesn't want to, but would he legally have that option to ask the district court for that? Legally, I suppose he would, yeah. I mean, there's amended complaints. You'd have to amend your complaint, wouldn't you? We would have to amend the complaint, and that would be an option on the table at that point. We're sort of getting ahead of ourselves. We haven't figured this one out yet. By the way, counsel is correct about the non-economic damages. Those would not, I don't believe that they're allowed under the statute of the case law. Emotional distress or anything like that. Counsel, during the investigation, was Mr. Polan allowed to submit names for the investigation? I believe the record reflects that when they got to the point of interviewing him, he did submit three names, something like that. However, those names do not appear in the front of the investigation report that you have in the supplemental, I'm assuming in the excerpt of the record. They're not part of the 17 that you see in the front there. The inference is they were not interviewed? I believe they were interviewed, but I also believe that their statements weren't really given any weight, and I think a very good evidence of that is the fact you don't even see them at the front of the investigation report. They're not even listed. Okay. Well, we've taken up a lot of your time with our questions, so, you know, if you need another minute or two, we're giving Mr. Keeney a little extra time. I believe I've said everything I need. Thank you very much. Thank you very much, Mr. Freeman.  Thank you, Your Honor. At the very outset, I want to point out to the Court that the Supreme Court now has in front of it a case called DCI Coca-Cola versus EEOC, in which cert was granted in January, and it is considering the question of what level of proof is required when you've got a subordinate decision-maker and a final decision-maker who was not biased. The subordinate was biased. Under this statute or Title VII? I believe it's Title VII, yes. Could you give the citation to Ms. Ellis before you leave? You don't have to use up your time on that now. Yes. I believe it's 06341 docket number in the Supreme Court, and that's out of the Tenth Circuit. But the significant point in that case is that it is common ground among all the parties in that case that an independent appraisal of the facts by the employer cuts off liability. The question in that case was, is the difference between the majority and the dissent in the Fourth Circuit's 2004 en banc decision in Hill, which is whether it is a true rubber stamp test or a substantial influence sort of test. But what everyone agrees on is when the, is if the employer says, okay, I'm not taking the facts from any of you, I'm going to go look at the facts myself, then that is the end of the line. That's no liability because the employer's decision, so long as it's based on the end of that, on that investigation, is not motivated by impermissible bias. And every circuit to reach the question, and all the cases are cited in our brief, has held that that sort of independent appraisal is all that's necessary. And I just think it's important to take a step back here and emphasize that there is nothing more that the Customs Service in this circumstance could reasonably have been expected to do than to appoint a panel of three people who had no relationship between the parties to figure out what happened. And, and these were grave, grave allegations that Mr. Hillbery made about Mr. Poland's behavior. And I point out page 85 of the record, the investigative inquiry panel leader, Mr. Tine, talking about how when he interviewed people who worked for Mr. Poland, they broke out crying in fear that they would be retaliated against for their even participating in this, in this thing. That's a serious, serious problem. And it was essential that the Customs Service investigate it. Now, having undertaken to investigate it, I think the Customs Service did a remarkable job of doing its best to ensure a fair and impartial process. Yeah, but what was Mr. Hillbery's status within, what was his rank or level within the system? He was the senior agent in charge, or is that the, is that the title, the senior agent in charge in Denver, and had responsibility for the Customs Service operations in parts of the West Coast. So. He was from Colorado all the way west? I don't know if it was every state. You know, it was, it included Portland, Seattle, and a couple other places. So initially, Mr. Mr. Poland was supervised by the agent in Seattle. That's right. And then they reorganized in some way, and he became subject to supervision of the guy in Denver. That's right. And then, but all of these people were then subject to supervision from agency headquarters in Washington, D.C. And the point that, I mean, Mr. Eight people were in the same kind of position as Mr. Hillbery throughout the nation. The SAICs? I'm not sure. There was a substantial number. I know Mr. Poland, for example, had the opportunity at one point in his career to be the SAIC, and I believe it was Charleston, South Carolina, and he turned that down. There are a lot of people in this position, right? At the level of Mr. At the level of Mr. Hillbery, yes. Hillbery? Yes. And the point here, and I think what your question goes to, is Mr. Keeney's suggestion that he was high enough up that he was the employer. The Supreme Court just had substantial influence. Well, the Supreme Court decision in the Burlington, not the most recent Burlington case, the Burlington v. Ellerth case, said that what you look to is the agency decision-maker with principal responsibility for the employment action, and it is uncontested in this case. And Mr. Hillbery had no authority to order a transfer or a demotion or anything like that. The principal decision-maker here was Bonnie Tischler, the Assistant Commissioner for Customs, who made her decision, that's also uncontested, based on the recommendations of the Discipline Review Board, which is the Customs Service's standing board for evaluating disciplinary procedures for people in the agency. So the agency has that board in order to ensure constancy and consistency in disciplinary actions. That's in the record in the testimony of Bob Casey, who is on the Disciplinary Review Board. You know, if the manager with the animus, Mr. what's his name again? Hillbery. Okay. Mr. Hillbery had initiated the investigation with a complaint, you know, look into this, look into that. But hadn't provided a long witness list, the government would have a much easier position. And so, you know, if we adopt a substantial influence or material factor test, I guess if the circuit hasn't done yet, if we were to adopt such a test, what's your position as to whether this would satisfy that test? Because Mr. Freeman says it would definitely satisfy that. Well, I'm Mr. Freeman. Excuse me. Yes. No, I don't think it would satisfy that test, Your Honor. And the reason is, if there is Mr. Keeney said that. Sorry, I got kind of the wrong place. The reason is that there is no suggestion, indeed, Mr. one searches Mr. Poland's brief in this appeal and all of his papers in the district court in vain for any suggestion that Ms. Tischler, the members of the Discipline Review Board or the people who investigated the facts, and that's the key, were motivated in any regard impermissibly. And so, it is clear and in fact uncontested on this record that the record on which the agency made its decision was untainted by bias in that the people who assembled it were not biased. Now, it's true that they interviewed Mr. Hillbery and took evidence from him. Any responsible employer under the circumstances would have done that. But they also interviewed Mr. Poland and took 180 pages of affidavit evidence from him and attached that to the agency's investigative inquiry report. They had both sides of the story. And I suggest to you that no more could have been required of an employer under these circumstances than to talk to the two people making the accusations and the other people who were involved in the circumstances and come to their own conclusion. And as to the suggestion that, yes, 15 or 17 of the witnesses were critical of Mr. Poland, I suggest to you that's because the agency was right that he wasn't a good manager. If, I mean, the one thing we know is it cannot be the law that if, that no matter what the administrative inquiry uncovered, that he was stealing money from a company safe or something, that the employer couldn't take action against him because the person who brought it to the employer's attention was motivated by less than altruistic motives. The law has to be that if you find something that's worthy of an independent of some kind of employment action, then you can act on that so long as you make your decision based on that and not on impermissible motives. And we suggest that that's what the record in this case shows. Thank you. Okay, Mr. Freeman. Mr. Keeney, we appreciate the argument from both sides. Very nicely argued. The Court will now take a recess for 15 minutes.
judges: Gould, Paez, Rawlinson